HELLIWELL and another *v.* GRAND TRUNK RAILWAY OF CANADA.

*(Circuit Court, E. D. Wisconsin.* February 4, 1881.)

1. COMMON CARRIER—DELAY IN TRANSPORTATION—LIABILITY.

H. & Co. shipped flour from Milwaukee to London, under a contract which required the defendant to transport the flour by boat to Ludington, Michigan, thence by rail to Portland, and thence by steamship to London. In an action to recover damages for delay of the flour at Portland,—

*Held,* that as the bills of lading constituted a through contract, i

was the duty of the carrier to deliver the flour in London, and to do so within a reasonable time; and that it was as much its duty to seasonably provide vessels for ocean transportation as to furnish cars for the land carriage.

That if, at the time of making the contract of shipment, the carrier had no doubt, and if the condition of business on its lines gave it no ground for doubting, that suitable means would be at its command within the usual and ordinary time for conveying the flour from Portland to London, and if all reasonable efforts were seasonably employed to obtain such means, and the delay was solely occasioned by an extraordinary and unusual influx of freight upon its lines for foreign export, arising subsequently to the making of the contract, so that it was thereby rendered impossible for the carrier, with proper diligence on its part, to procure vessels to carry the flour within a reasonable time, the carrier would not be responsible for the delay.

But if, at the time the contract of shipment was made, there was already an accumulation of business on the carrier's lines, which incapacitated it, or might reasonably be expected to incapacitate it, for transporting and delivering the flour within a reasonable time, and this was then known to the carrier, or might have been known by proper effort on its part, or if there were then reasonable grounds for a belief on the part of the carrier that such was the state of the case at the time, then the carrier would be liable for the delay, although it was occasioned by such accumulation of business.

In such case it is the carrier's duty to inform the shipper of the condition of its lines, so that he may exercise his right to select some other line for the transportation of his property; and if the carrier fails to do this, and takes the property in the face of threatened inability to transport it with requisite dispatch, it must answer for the consequences of the delay.

A carrier has no right to take a shipper's property for transportation, concealing from him at the time existing circumstances within its knowledge, or within its fair and reasonable means of knowledge, and not within the knowledge of the shipper, that may incapacitate, or may be fairly expected to incapacitate it for the full performance of its duty in transporting the property, and then claim exemption from liability.

*Van Dyke & Van Dyke,* for plaintiffs.

*G. W. Hazelton,* for defendant.

DYER, D. J., (*charging jury.*)    This is an action brought by the plaintiffs, who compose a firm doing business in this city, against the defendant company to recover damages for the alleged failure of the defendant to transport certain quantities of flour which it undertook to carry from Milwaukee to London, England, within such time as it is claimed the same should have been transported and delivered to the consignees.

From admissions contained in the answer, and from a stipulation put into the case by counsel for the respective parties, it appears that there is no controversy as to certain facts, viz.: that 7,558 bags of flour, of the weight of 140 pounds each, were delivered to the defendant for transportation; that the price to be paid for such transportation was 56 cents gold per hundred pounds; that the flour was to be transported by the Northern Transit line from Milwaukee to Ludington; thence by the Flint & Pere Marquette Railway and the defendant's line of road to Portland; and thence by steamship to London.

It is stipulated that a certain tabular statement, which has been exhibited to you, correctly states the dates of actual delivery of the several shipments of flour to the Northern Transit line at Milwaukee, the dates of departure from Milwaukee of the several steamers of that line laden with the flour, the names of such steamers, the quantity of flour by them respectively carried; the dates of arrival of the different shipments at Portland, and of the delivery of the same on board steamships bound for London; the names of such steamers, and the dates of their departure from Portland and arrival at London; and it is expressly stipulated that the steam-ship Argosy left Portland March 27, 1880, and arrived in London April 7th; that the steam-ship Bothel left Portland April 2d, and arrived in London April 22d; and that the Argosy and Bothel, and the steam-ships Herworth and Woodthorn, which two last-named vessels carried the flour, were all employed by the defendant in the business of transportation, and were all vessels of equal class for marine insurance. All these are uncontroverted facts in the case.

It appears that the flour was all delivered here in Milwaukee to the Transit line at various dates between February 26th, inclusive, and March 19th, inclusive; the largest portion being delivered on February 26th and March 2d. It was shipped on various days between February 26th and March 19th, both inclusive, and arrived in Portland at different dates between March 13th, inclusive, and March 30th, inclusive; the most of it so arriving on and prior to

March 19th. It was all carried to London on the vessels Woodthorn and Herworth. That part carried on the Woodthorn was delivered to her April 17th, 18th, and 19th, and she sailed on the 19th and arrived in London May 15th. That part of the flour carried on the Herworth was delivered to her April 27th and 28th, and she sailed on the 29th and arrived in London May 15th, on the same day that the Woodthorn arrived.

Now, gentlemen, the first question naturally arising is: What was the contract under which the defendant undertook the transportation of this flour, and what were the rights, duties, and obligations of the parties under such contract as they in fact made? The plaintiffs have contended that the flour was received by the defendant and shipped under a verbal contract alleged to have been made on the 25th, 26th, and 28th days of February, 1880, by the witness Cole, in their behalf, with the witness Young, acting in behalf of the defendant; and that this contract was that the flour should be carried to Portland by the route and on the lines named, and should be shipped thence to London by the steam-ship Argosy. It has been claimed that by this alleged agreement the defendant undertook absolutely that the flour should be carried on that vessel, and no other. This claim, of course, wholly ignores the bills of lading in evidence, and which confessedly the plaintiffs subsequently received from the defendant's agent. Upon looking into the bills of lading we find that they provide that the flour shall be shipped at Portland "upon the vessel called the 'Argosy,' (or other vessel of equal class for marine insurance.)" And herein we see that the bills of lading differ from the alleged verbal contract, in that they, by their terms, give the defendant the right to ship the flour on the Argosy or on any other vessel of equal class for insurance. It has been contended by the plaintiffs that, with reference to the vessel on which the flour was to be shipped from Portland, the alleged verbal contract must prevail as against this provision in the bills of lading, while on the part of the defendant it has been claimed that the bills of lading constitute the contract on the subject.

Upon the undisputed evidence I am of the opinion, (as already expressed to counsel,) and must instruct you, that in all respects wherein the bills of lading did not limit the defendant's liability as a common carrier, they constituted the contract between the parties; and, therefore, so far as this question of the vessel on which the flour should be shipped from Portland is concerned, the defendant was not bound to ship it on the Argosy alone, but had the right to ship it on that vessel or any other vessel of equal class with the Argosy for marine insurance. The contract, then, was that the defendant should take the flour in question at Milwaukee, convey it to Ludington by the Northern Transit line, thence by the Fint & Pere Marquette Railroad and the defendant's line to Portland, and thence by the steam-ship Argosy or some other vessel of equal class for marine insurance to London. The bills of lading contained a condition that the defendant should not be liable for delays in transporting the flour occasioned by overpressure of freight; and there has been a good deal of controversy on the trial as to the effect of this condition, and as to whether the condition was binding upon the plaintiffs as part of the contract. In view, however, of the fact that in the opinion of the court that clause would, if regarded as part of the contract, give no greater exemption to the carrier than it would be entitled to by law, all question as to whether that clause was part of the plaintiffs' contract or not, becomes of no importance in the view of both counsel and the court, and it is therefore unnecessary to submit to you questions as to the character and effect of that condition which otherwise might be material.

It is claimed by the plaintiffs that the flour in question was not transported by the defendant and delivered in London with proper dispatch; * * * that it was unreasonably detained in Portland after its arrival at that port. It is claimed that these alleged delays were attributable to the fault of the defendant, and to its neglect to furnish such means of conveyance and facilities for transportation as the company were, under its contract, bound to furnish to enable it to deliver the flour in London within a proper and rea-

sonable time, and that in consequence, and because of a decline in the price of flour between the time when it is alleged it should have been delivered in London and the time when it was actually delivered, the plaintiffs have been subjected to a loss which the defendant should make good to them.

It is claimed by the defendant that the flour was transported and delivered within a reasonable time under the circumstances existing at the time. It is admitted that there was delay in forwarding the flour from Portland, but it is insisted that the defendant was, when it made its contract with the plaintiffs, well supplied with the necessary equipments, facilities, and means for transporting all the freight which could be ordinarily expected to seek transportation upon its route, and that the delay occurring at Portland was occasioned by a sudden and extraordinary influx of ocean freight, which was beyond the defendant's control, and which it could not foresee and anticipate, nor by the exercise of any diligence provide for; and that it ought not to be held responsible for circumstances, which, as it is claimed, excuse the alleged delay in forwarding the flour. The obligations assumed by the defendant in this transaction were the usual obligations of a common carrier, among which was that of transporting this flour to the place of consignment with proper dispatch; that is, within a reasonable time after it was delivered to the defendant for shipment. This it was incumbent on the defendant to do under this contract; and, as to what is meant by reasonable time, perhaps no rule can be more satisfactorily laid down than that the transportation must be accomplished by the carrier "with all convenient dispatch with such suitable and sufficient means as he is required to provide for his business." Hutchinson on Carriers, § 328.

The question of reasonable time is one of fact, and may be determined by the length of the journey, the modes of conveyance, the season of the year, the state of the weather, "and any other circumstances which may properly be taken into consideration by the jury in finding whether the carrier has been guilty of improper delay." Hutchinson on Carriers,

§ 329. This, then, was the general duty of the defendant; that is, to convey this flour to London, and there deliver it to the consignees, within a reasonable time. Something has been said in the arguments of counsel as to the alleged failure of the defendant to have steam-ships at its command to receive this flour on its arrival in Portland. This was a through contract. It was therefore as much the duty of the defendant to furnish a vessel or vessels for the ocean transportation of this flour as it was its duty to furnish cars to transport it from Ludington to Portland. It was not, however, necessarily its duty to have vessels in waiting at the very moment, or on the very day, the flour should arrive in Portland; but it was its duty to provide means of conveyance by which reasonable dispatch should be afforded, and improper delay avoided. The law in such case exacts nothing unreasonable, but it does require diligence and reasonable promptness, under the circumstances, in furnishing means of conveyance. The fact that, if the defendant did not ship the flour on the Argosy, it had the right to ship it on any other vessel of equal class for marine insurance, did not in any manner relieve the defendant of its duty in the matter of forwarding the flour with proper dispatch. If it selected any other vessel than the Argosy it was as much bound to transport the flour within a reasonable time as if the shipment was made in that particular vessel. It may be well to state to you further, as a general proposition of law with reference to the obligation of a common carrier to provide sufficient means of conveyance, that it is "the first duty of the carrier to provide himself with all the facilities and appliances for the transportation of such goods as he holds himself out as ready to engage in the carriage of. He must put himself in a situation to be at least able to transport an amount of freight of the kind which he proposes to carry equal to that which may be ordinarily expected to seek transportation upon his route," and he will not "be excused for not being provided with a sufficiency of conveyances and other means for the transportation of that which he may reasonably expect to be offered." But if there was delay in trans-

porting any of the flour to Portland, or in forwarding it from that point, which under ordinary circumstances would make the defendant liable, it is claimed in its behalf that it was excusable delay, and that the defendant ought not to be held answerable therefor.

There is testimony tending to show that there was, at that time, an extraordinary press of foreign export traffic, and such an accumulation at Portland of freight bound for foreign ports as rendered it, as it is claimed, impossible to provide immediate ocean transportation. Upon this question, and as to when or under what circumstances an overpressure of freight will excuse delay, I instruct you that if, after the defendant took this flour for shipment, and after the performance of the contract to carry was begun, there occurred, without fault of the defendant, an extraordinary and unforeseen influx upon the defendant's lines of freight for foreign export, and that the defendant was thereby unexpectedly incapacitated for forwarding the flour with usual dispatch, and that the delay of the flour was wholly occasioned by such unusual and unexpected pressure of freight, and not in any degree by negligence of the defendant, then, and under such circumstances, the defendant would not be responsible for such delay so occasioned. It would, however, be the duty of the defendant, in such a state of the case, to forward the flour promptly after the causes of such excusable delay were removed. Putting the proposition in substantially the form of one of the instructions which I am asked to give you: If, at the time of making the contract with the plaintiffs for the transportation of this flour, the defendant had no doubt, and if the condition of business on its lines gave it no grounds for doubting, that suitable means would be at its command within the usual and ordinary time for conveying the flour from Portland to London; and if all reasonable efforts were seasonably employed by the defendant to obtain such means, and the alleged delay was solely occasioned by an extraordinary and unusual influx of freight upon its lines for foreign export, arising subsequently to the making of the contract with the

plaintiffs, so that it was thereby rendered impossible for the defendant, without any negligence on its part, to procure a vessel or vessels to carry the flour within what would be, under usual circumstances, a reasonable time,—then the defendant would not be responsible for the consequences of such delay. On the other hand, if, at the time the defendant contracted to carry this flour, there was already an accumulation or press of business on its lines which incapacitated the defendant, or might reasonably be expected to incapacitate it, for performing its duty by delivering the flour in London within a reasonable time, and this was known to the defendant at the time, or might have been known or ascertained by proper effort on its part, or if there were then reasonable grounds for a belief on the part of the defendant that such was the state of the case at the time, the defendant would be liable for the delay, although it was occasioned by such accummulation or press of business; for, in such case, it would be the carrier's duty, if it would avoid liability, to inform the shipper of the condition of its lines, so that he might exercise his right to select some other line for the transportation of his property; and if the carrier, under such circumtances, fails to do this, and chooses to take the property in the face of threatened inability to transport it with requisite dispatch, it must answer for the consequences of the delay. A carrier has no right to take a shipper's property for transportation, concealing from him at the time existing circumstances within its knowledge, or within its fair and reasonable means of knowledge, and not within the knowledge of the shipper, that may incapacitate, or may be fairly expected to incapacitate it for the full performance of its duty in the transportation of property, and then claim exemption from liability. Whether, upon this question, the facts in this case are as claimed by the plaintiffs or as claimed by the defendant, you are to determine, and for this purpose you will look into the evidence.

There is testimony on the subject of the increase of traffic on the defendant's road, and the accumulation of freight at

Portland.    *    *    *    *    *    *    *    *    *
You will determine, upon all the testimony in the case,
whether the alleged increase of business and accumulation of
export freight was sudden, unlooked for, and extraordinary,
and occurring after the contract with the plaintiffs was made, or
whether it existed at the time the defendant took the flour for
transportation, or could have been, under all the then-exist-
ing circumstances, reasonably anticipated and expected.
Testimony has also been given of the efforts made by the de-
fendant to obtain steamers to carry this flour, and in this
connection I should say to you that the mere fact that the
defendant could not get steamers sooner than it did, would
not relieve it from liability for delay unless such inability was
solely attributable to such overpressure of freight as, within
the instructions I have given you, would excuse the delay.
To aid you in passing upon the questions involved, you have
by the stipulation in evidence, as I have before stated, the
dates when the flour was delivered to the defendant in Mil-
waukee and when the shipment on the steamers of the Transit
line began; the dates of arrival in Portland; of delivery
to steam-ships at that port, and of the sailing of the steam-
ships, and of arrival in London, and other facts agreed upon in
the stipulation of which I have already spoken; and, upon all
the evidence, you will say whether this flour was delivered in
London within a reasonable time after its delivery to the de-
fendant; and, if it was not, whether the delay is excusable
within the principles of law which I have stated.    If the flour
was delivered within a reasonable time under the circum-
stances of the case, or if it was not, and the delay was excus-
able within the principles the court has laid down, then the
defendant is entitled to a verdict.    If, on the other hand, the
flour was not delivered in London within a reasonable time
after the defendant took it for transportation, and if the delay
was not solely caused by facts and circumstances which make
it excusable within the principles of law stated, then the
plaintiffs ought to recover.    *    *    *    If you should find the
plaintiffs entitled to a verdict, the measure of damages would
be the difference between the market value of the flour which

was improperly delayed, at the time when it should have been delivered in London and its market value when it was in fact delivered, which was May 15, 1880.

Verdict for plaintiffs for $1,500.